IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| _____ ) | |
| THERESA MONTURANO, ) | |
| Derivatively on Behalf of Nominal ) | |
| Defendant GROUPON, INC., ) | |
| ) | No. |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ERIC P. LEFKOFSKY, PETER J. BARRIS, ) | |
| KEVIN J. EFRUSY, MELLODY HOBSON, ) | |
| BRADLEY A. KEYWELL, THEODORE J. ) | |
| LEONSIS, ANDREW D. MASON, ) | |
| and HOWARD SCHULTZ ) | |
| ) | Jury Trial Demanded |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| GROUPON, INC., ) | |
| ) | |
| Nominal Defendant. ) | |
| _____ ) | |

**SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL**

Plaintiff, Theresa Monturano ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant, Groupon, Inc. ("Groupon" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

**NATURE AND SUMMARY OF THE ACTION**

1.     Groupon is an internet commerce company engaged in the direct marketing of

discounts on goods and services to customers primarily via email.

2.      Founded in 2008, the Company announced its intent to go public in 2011. Between its first Form S-1 Registration Statement filed on June 2, 2011 and the Initial Public Offering ("IPO") on November 3, 2011, the Company was forced to restate and change multiple IPO-related documents because they contained improper and misleading accounting metrics and/or misrepresented the financial position of the Company.

3.      On November 3, 2011, the Company went public and sold 35 million shares at $20 per share.

4.      Approximately five months after the completion of the IPO, Groupon announced its first set of financial results as a public company on February 8, 2012.  Shortly thereafter, on March 30, 2012, the Company was forced to restate those results and admit that it had identified material weaknesses in its controls over accounting.  What became clear from the restatement in March 2012 was that the Company was not as profitable as had been initially represented.  The reaction by investors was swift; the Company's stock lost significant value, the Securities and Exchange Commission ("SEC") initiated a probe into the problems, and multiple securities class actions were filed.

5.      The defendants were all members of the board during the pre-IPO restatements and accounting problems and continue to be directors at present.  These defendants were on notice that the Company was susceptible to accounting problems, that accounting controls had been a problem in the past, and that the Company would be seriously harmed by a lack of sufficient controls over accounting.  Nonetheless, the defendants permitted Groupon to function without sufficient controls and the Company has now been gravely harmed.  Compounding their breach of fiduciary duties, defendants failed to disclose the accounting issues with due candor.

### JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Virginia, and no Defendant is a citizen of that state. This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

7. Venue is proper in this Court because Groupon maintains executive offices in this District, a portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### THE PARTIES

**A. Plaintiff**

8. Plaintiff is, and was at all times relevant hereto, an owner and holder of Groupon common stock.

**B. Defendants**

9. Nominal defendant Groupon is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 600 West Chicago Avenue, Suite 620, Chicago, Illinois. According to its public filings, Groupon is a local commerce marketplace that connects merchants to consumers by offering goods and services at a discount via internet and email promotions. The Company was founded in 2008 as ThePoint.com and subsequently changed its name to Groupon, Inc. Groupon went public via the IPO in November 2011.

10.     Eric P. Lefkofsky ("Lefkofsky") is a co-founder and Executive Chairman of Groupon.

11.     Bradley A. Keywell ("Keywell") is a co-founder of the Company and has served as a director of Groupon since 2006.  Keywell is a member of the Compensation Committee and the Nominating and Governance Committee.

12.     Andrew D. Mason ("Mason") is a founder of Groupon and has served as the Company's Chief Executive Officer ("CEO") since 2008.  Mason is also a director.

13.     Peter J. Barris ("Barris") has served as a director of Groupon since 2008.  He is the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

14.     Kevin J. Efrusy ("Efrusy") has served as a director of Groupon since 2009. Efrusy is a member of the Audit Committee and the Compensation Committee.

15.     Mellody Hobson ("Hobson") has served as a director of Groupon since prior to the IPO.

16.     Theodore J.  Leonsis ("Leonsis") has served as a director of Groupon since 2009. Leonsis is Chair of the Audit Committee and a member of the Compensation Committee and the Nominating and Governance Committee.

17.     Howard Schultz ("Schultz") has served as a director of Groupon since 2011. Schultz is a member of the Audit Committee.

18.     The defendants referenced in ¶¶ 10-17 shall be collectively referred to herein as the "Individual Defendants."

### DEFENDANTS' DUTIES

19.     By reason of their positions as officers, directors, and/or fiduciaries of Groupon

4

and because of their ability to control the business and corporate affairs of Groupon, Defendants owed Groupon and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Groupon in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Groupon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Groupon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

20. Defendants, because of their positions of control and authority as directors and/or officers of Groupon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Groupon, each of the Defendants had knowledge of material non-public information regarding the Company.

21. To discharge their duties, the officers and directors of Groupon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Groupon were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP");

    d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

22.    According to the Charter of the Audit Committee, the Audit Committee Defendants were and are responsible for, among other things:

    a. Discussing with management and the independent auditors the adequacy and effectiveness of accounting and financial controls, including the Company's system to monitor and manage business risk and legal and ethical compliance policies;

    b. Reviewing with management and the independent auditors the Company's quarterly and annual financial statements, including judgments regarding the quality (not just the acceptability) of accounting principles and policies, the reasonableness of significant judgments and the clarity of the disclosures in the financial statements;

    c. Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

    d. Reviewing with management the Company's earnings press releases (including any use of pro forma or other non-GAAP information) prior to the issuance of any such press release;

    e. Discussing with management and the independent auditors, as appropriate, any correspondence with regulators and governmental agencies and any employee complaints or reports that raise material issues regarding the Company's financial statements, accounting policies or internal controls;

    f. Discussing with management and the independent auditors significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; and

    g. Taking appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices and ethical behavior.

## SUBSTANTIVE ALLEGATIONS

23.     Groupon operates an e-commerce marketplace that connects merchants to consumers by offering goods and services at a discount in North America and internationally. The Company conducts business with hundreds of different types of businesses, including health and beauty, food and drink, activities, events, services, and retail.  Groupon sends daily emails to its subscribers containing discounted offers for goods and services that are targeted by location and personal preferences.  Consumers can also access Groupon's deals directly through the Company's Website and mobile application. The Company was founded in 2008.

24.     In June 2011, the Company filed a Form S-1 Registration Statement and Amendments thereto (collectively the "Registration Statement") in connection with its IPO. The Registration Statement was declared effective by the SEC on November 3, 2011.

25.     The first Form S-1, filed on June 2, 2011 contained an unconventional non-GAAP accounting metric, adjusted consolidated segment operating income ("ACSOI") that permitted Groupon to exclude substantial expenses and thus allowed the Company to show a positive operating income metric even though it was unprofitable.  The use of ACSOI was criticized both by investors and the SEC as misleading.  Under significant pressure, the Company subsequently amended its Form S-1 on August 10, 2011 to eliminate the use of ACSOI.

26.     On September 23, 2011, Groupon was forced to amend its Form S-1 Registration Statement again.  The amendment was necessary after the SEC forced Groupon to restate its revenue for the first half of 2011 from $1.5 billion in revenue to $688 million.  The incredible size of this change shocked investors and sparked questions about whether the Company could even afford to go public.  Nevertheless, the Company did go public as planned.

27.     Part of the Registration Statement was the Prospectus for the IPO.  Among other

things, the Prospectus stated:

**Our Advantage**

*Customer experience and relevance of deals.* We are committed to providing a great customer experience and maintaining the trust of our customers. We use our technology and scale to target relevant deals based on individual subscriber preferences. As we increase the volume of transactions through our marketplace, we increase the amount of data that we have about deal performance and customer interests. This data allows us to continue to improve our ability to help merchants design the most effective deals and deliver deals to customers that better match their interests.

*Merchant scale and quality.* In the nine months ended September 30, 2011, we featured deals from over 190,000 merchants worldwide across over 190 categories of goods and services. Our salesforce of over 4,800 sales representatives enables us to work with local merchants in 175 North American markets and 45 countries. We draw on the experience we have gained in working with merchants to evaluate prospective merchants based on quality, location and relevance to our subscribers. We maintain a large base of prospective merchants interested in our marketplace, which enables us to be more selective and offer our subscribers higher quality deals. Increasing our merchant base also increases the number and variety of deals that we offer to consumers, which we believe drives higher subscriber and user traffic, and in turn promotes greater merchant interest in our marketplace.

*Brand.* We believe we have built a trusted and recognizable brand by delivering a compelling value proposition to consumers and merchants. A benefit of our well recognized brand is that a substantial portion of our subscribers in our established markets is acquired through word-of-mouth. We believe our brand is trusted due to our dedication to our customers and our significant investment in customer satisfaction.

28.     The Prospectus additionally made the following statements about the Company's financial results:

SUMMARY CONSOLIDATED FINANCIAL AND OTHER DATA

We present below our summary consolidated financial and other data for the periods indicated. Financial information for periods prior to 2008 has not been provided because we began operations in 2008. The summary consolidated statements of operations data for the years ended December 31, 2008, 2009 and 2010 and the balance sheet data as of December 31, 2009 and 2010 have been derived from our audited consolidated financial statements included elsewhere in this prospectus. The balance sheet data for the year ended December 31, 2008 was derived from financial statements that are not included in this prospectus. The summary consolidated statements of operations data for the periods ended September 30, 2010 and 2011 and the balance sheet data as of September 30,

2011 have been derived from our unaudited consolidated financials statements included elsewhere in this prospectus. ***The unaudited information was prepared on a basis consistent with that used to prepare our audited financial statements and includes all adjustments, consisting of normal and recurring items, that we consider necessary for a fair presentation of the unaudited period.***

\* \* \*

Revenue Recognition

We recognize revenue from Groupons when the following criteria are met: persuasive evidence of an arrangement exists; delivery has occurred; the selling price is fixed or determinable; and collectability is reasonably assured. These criteria are met when the number of customers who purchase the daily deal exceeds the predetermined threshold, the Groupon has been electronically delivered to the purchaser and a listing of Groupons sold has been made available to the merchant. ***At that time, our obligations to the merchant, for which we are serving as an agent, are substantially complete. Our remaining obligations, which are limited to remitting payment to the merchant and continuing to make available on our website the listing of Groupons previously provided to the merchant, are inconsequential or perfunctory***. We record as revenue the net amount we retain from the sale of Groupons after paying an agreed upon percentage of the purchase price to the featured merchant excluding any applicable taxes. Revenue is recorded on a net basis because we are acting as an agent of the merchant in the transaction.

29.     Furthermore, the Prospectus included a letter by Groupon's CEO, defendant Mason.  The letter, attempting to refute some of the criticism over the Company's various accounting problems leading up to the IPO, stated the following in part:

Dear Groupon,

This weekend, I did a Google News search on our company—my first in awhile. The first story that popped up was called The Fall of Groupon: Is the Daily Deals Site Running Out of Cash? I laughed when I read the headline (in the car by myself, weirdly). First—with this article, the degree to which we're getting the s\*\*\* kicked out of us in the press had finally crossed the threshold from "annoying" to "hilarious." ***Second, I was struck by the irony—I had just finished a board meeting last Wednesday saying this to myself: I've never been more confident and excited about the future of our business***.

\* \* \*

I'm going to spend the rest of this email explaining why I'm so excited. You need

9

some ammo to argue back against your blog-reading "friends" (silently argue in your mind, that is—you can't actually say any of this yet), and I've been told that the "what have you ever done with your life that's so great?" rebuttal isn't working as well for you guys as it has for me. While we've bitten our tongues and allowed insane accusations (like in the article above) to go unchallenged publicly, it's important to me that you have the context necessary to brush this stuff off.

I'll summarize my excitement with four points: 1) Growth in our core business is strong 2) Our investments in the future—businesses like Getaways & NOW— look great, 3) We are pulling away from competition, and 4) We've built a great team that I would pit against anyone. In other words, all the stuff that one would want to look good? It looks good. Many of the long-term unknowns of our business are becoming known, and we like the answers. I will now elaborate in a level of financial detail that will give Jason Child a stomach ulcer.

1.      GROWTH IN THE CORE BUSINESS

* * *

1.      We are currently spending more than just about any company ever on marketing—in Q2, we spent nearly 20% of our net revenue on marketing, while a typical company spends less than 5%. Why do we spend so much? The simple answer is "because it works." But that's only part of what makes our situation special.

2.      Our marketing—at least the customer acquisition marketing that we remove from ACSOI—is designed to add people to our own long-term marketing channel—our daily email list. Once we have a customer's email, we can continually market to them at no additional cost. Compare this to Johnson and Johnson, McDonald's, or most other companies. If I'm a Johnson, and I'm trying to sell you a box of Band Aids, I have to keep spending money on commercials and magazine ads and stuff to remind you about how sweet Band Aids are, even after you've bought your first box. With Groupon, we just spend money one time to get you on our email list, and then every day we email you a reminder of the sweetness of our metaphorical Band Aid. There is no cost of reacquisition—that's unusual (and we created ACSOI to point that out). If Johnson wanted to follow the Groupon strategy, he would have to start a free daily newspaper about bandages and then run Band Aid ads in it every day.

3.      Eventually, we'll ramp down marketing just as fast as we ramped it up, reducing the customer acquisition part of our marketing expenses (the piece that we remove in ACSOI) to nominal levels. We are spending a ton now because we're acquiring as many subscribers as we can as quickly as we can. We aren't paying attention to marketing budget (just marketing ROI) in the way a normal company would, because we know that even if we wanted to continue to spend at these levels, we would eventually run out of new subscribers to acquire. So our

customer acquisition spend drops severely to reflect the fact that eventually we'll run out of people we can add to our email list. We view this internally as a very large one-time expense and then our job forever after will be to continually convert these subscribers into customers and to make sure our customers keep buying from us. Ongoing, the normal marketing dollars we spend are not something we would remove from our internal calculation of ACSOI.

\* \* \*

2.     NEW BUSINESS LINES ARE BOOMING

Travel and Product are enormous opportunities. After only a few months, they're already making up 20% of revenue in some countries. We sold $2M worth of mattresses in the UK—in one day! Groupon Getaways will do $10M in its first calendar month—which you might think is awesome, but we're actually disappointed with those results because we know how much better we'll be doing soon.

While there's still a ton of work to do, Groupon Now! continues to see weekly double digit growth. The model works and I believe it will play a major part in the future of our global business as more merchants and customers join the marketplace.

3.     WE ARE PULLING AWAY FROM COMPETITION

If there's a question I've received from Groupon skeptics more than any other, it's, "how will you fend off the competition—especially massive companies like Google and Facebook?" I could give a dozen reasons to bet on Groupon, but it's impossible to predict the future or the actions of others. Well, now the sleeping giants have woken up—and the numbers are showing that what was proven true with literally thousands of other competitors is just as true with the incumbents of the Internet: it's kind of hard to build a Groupon. And since anyone with an Internet connection can track the performance of our competitors, I can be more specific:

- Google Offers is small and not growing. In the three markets where we compete, we are 450% of their size.

- Yelp is small and not growing. In the 15 markets where we compete, our daily deals are 500% of their size.

- Living Social's U.S. local business is about 1/3rd our size in revenue (and smaller in GP) and has shrunk relative to us in the last several months. This, in part, appears to be driving them toward short-sighted tactics to buy revenue, like buying gift certificates from national retailers at full price and then paying out of their own pocket to give the appearance of a 50% off deal. Our marketing team has tested this tactic enough to know

11

that it's generally a bad idea, and not a profitable form of customer acquisition.

- Facebook sales are harder to track, but are even less significant at present.

My point is not that our competitors will fail—some may actually develop sustainable businesses, or even grow—after all, local commerce is an enormous market. ***The real point is that our business is a lot harder to build than people realize and our scale creates competitive advantages that even the largest technology companies are having trouble penetrating. And with the launch of NOW, I suspect our competition will have an even harder time in light of the natural barriers to entry that are needed to build a real-time local deals marketplace***.

* * *

FINAL THOUGHTS

I wrote this email because when I read some of the press this weekend, I realized a rational person could read this stuff and wrongly conclude that we're in trouble. The irony is hopefully clear: ***We've never been stronger***.

And while we've refrained from defending ourselves publicly, you've continued to create our best defense, with every department innovating new practices that are taking our business to the next level. Thanks for staying tough, determined, and agile throughout this process. For now we must patiently and silently endure a bit more public criticism as we prepare to birth this IPO baby—a breed for which there are no epidurals. If there's a silver lining, it's that we're almost on the other side, and the negativity leaves us well-positioned to exceed expectations with an IPO baby that, having seen the ultrasound, I can promise you is not one of those uglies.

I've been as candid as possible—hope this sheds some light on things. Reply with your questions if anything remains unclear. Amidst all this, I hope you remember what we're doing here—we are making history together. I guess you don't get to build something that reshapes the local commerce ecosytem without getting a few bruises. I'm so proud of the work we're doing, and I feel extraordinarily lucky to work on what I think is the best thing that's happened to small businesses since the telephone We've invented something that is catalyzing millions of dollars of local commerce every single day in 45 countries and fills the lives of millions of customers with unforgettable experiences—it's pretty remarkable.

Looking forward to getting this behind us!

Andrew

P.S.: I almost forgot to address the nonsense about us running out of money in the article above. If you apply the same logic used in the article, you'd have concluded long ago that companies like Amazon and Wal-Mart were running out of cash too. Both have often had payables far in excess of their cash. Finance geeks call this a working capital deficit. It's normal, manageable and a lot of folks actually believe it's good thing and would kill to get paid from their customers long before they have to pay their suppliers. We are generating cash, not losing it—we generated $25M in cash last quarter alone, adding to the $200M we had before. ***In other words, we're doing the opposite of running out of money***.

30.     On November 3, 2011, Groupon issued a press release announcing the pricing of

the IPO, which stated in part:

> Groupon, Inc. today announced the initial public offering of 35,000,000 shares of its Class A common stock at a price of $20 per share. In addition, Groupon has granted the underwriters a 30-day option to purchase up to an additional 5,250,000 shares of Class A common stock to cover over-allotments, if any. All of the shares of Class A common stock are being offered by Groupon. The company's shares are expected to begin trading on The NASDAQ Global Select Market on November 4, 2011 under the ticker symbol "GRPN."

31.     On December 2, 2011, Advertising Standards Authority Ltd. published an article

titled "ASA refers complaints about Groupon to OFT."  Among other things, the article stated:

> Following repeated breaches of the Advertising Code by MyCityDeal Ltd t/a Groupon, the Advertising Standards Authority is now referring complaints that we receive about Groupon's ads to the Office of Fair Trading (OFT). We are referring complaints that specifically concern Groupon's:
>
> - Failure to conduct promotions fairly, such as not making clear significant terms and conditions
>
> - Failure to provide evidence that offers are available
>
> - Exaggeration of savings claims
>
> We are taking this approach because, given Groupon's track record, we have serious concerns about its ability to adhere to the Advertising Code. It is in the public interest that we refer the matter to the OFT, the OFT being better placed to address any underlying issues concerning Groupon's trading practices generally.
>
> In 2011, the ASA has formally investigated and upheld complaints against Groupon's advertising on 11 occasions. We have also informally resolved 37 cases. We will continue working closely with the OFT on these issues to ensure

consumers are protected.

32.     On February 8, 2012, Groupon issued a press release containing its fourth quarter and full year 2011 financial results.  For the fourth quarter, the Company reported a net loss of $42.7 million, or ($0.08) diluted EPS, and revenue of $506.5 million.  The Company additionally reported a net loss of $350.8 million, or ($0.97) diluted EPS, and revenue for the full year 2011 of $1.6 billion.   Additionally, the Company gave first quarter 2012 guidance: income from operations was forecast between $15 million and $35 million and revenue was anticipated to be between $510 million and $550 million.  Among other things, the release stated:

> Revenue increased 194% to $506.5 million in the fourth quarter 2011, compared to $172.2 million in the fourth quarter 2010. The unfavorable impact from year-over-year changes in foreign exchange rates throughout the quarter was $3.5 million. Gross billings, which reflects the gross amounts collected from customers for Groupons sold, excluding any applicable taxes and net of estimated refunds, increased 201% to $1.25 billion in the fourth quarter 2011, compared with $415.3 million in the fourth quarter 2010.
>
> "Groupon had a strong fourth quarter and we finished 2011 having helped 250,000 local merchants across 47 countries grow their businesses while saving Groupon customers billions of dollars," said Andrew Mason, CEO and Co-Founder of Groupon. "We will continue to invest in new services and tools that help our merchant partners be more successful and drive local commerce around the world."

33.     On this news, Groupon's stock declined to $21.17 per share, but continued to trade above the IPO price because Groupon's improper accounting and overstated revenues had yet to be revealed.

34.     On March 30, 2012, after the market closed, the Company issued a press release announcing revisions to its fourth quarter and full year 2011 results.  The restatements reduced Groupon's fourth quarter 2011 revenue by $14.3 million after initially reporting sales of $506.5 million.  As a result, the Company's fourth quarter operating expenses increased and operating income decreased by $30 million, net income by $22.6 million, and EPS by $0.04.  Groupon

attributed the revisions to a shift in the Company's fourth quarter deal mix and higher price point

offers, which caused higher refund rates. The release stated in part:

> Groupon, Inc. today announced a revision of its reported financial results for its fourth quarter and year ended December 31, 2011. Groupon also affirmed its guidance for the first quarter of 2012.
>
> The revisions resulted in a reduction to fourth quarter 2011 revenue of $14.3 million. The revisions also resulted in an increase to fourth quarter operating expenses that reduced operating income by $30.0 million, net income by $22.6 million, and earnings per share by $0.04. Financial results for prior periods, including as of and for the nine months ended September 30, 2011, were not affected by the revisions.
>
> There is no change to Groupon's previously reported operating cash flow of $169.1 million for the fourth quarter 2011 and $290.5 million for the full year 2011. There is also no change to Groupon's previously reported free cash flow, which is a non-GAAP financial measure that reflects cash flow from operations less purchases of property and equipment, of $155.1 million for the fourth quarter 2011 and $246.6 million for the full year 2011.
>
> The revisions are primarily related to an increase to the Company's refund reserve accrual to reflect a shift in the Company's fourth quarter deal mix and higher price point offers, which have higher refund rates. The revisions have an impact on both revenue and cost of revenue. A more detailed explanation of the refund reserve is included in the Critical Accounting Policies and Estimates section of Groupon's Annual Report on Form 10-K for the year ended December 31, 2011, filed today with the Securities and Exchange Commission (SEC).
>
> "We remain confident in the fundamentals of our business, as our performance continues to highlight the value that we provide to customers and merchants," said Jason Child, Groupon CFO. Groupon affirmed its guidance contained in its February 8,2012 press release regarding expectations for first quarter 2012 revenue of $510 million to $550 million and income from operations of $15 million to $35 million. This guidance includes approximately $35 million for stock-based compensation and acquisition-related expense, and it assumes no material business acquisitions or investments and no further revisions to stock-based compensation estimates.

35.     Upon information and belief, the conduct Groupon admitted to above is a

violation of FASB financial accounting standard 48, governing the manner in which Companies

may estimate revenue for refundable products.  Because Groupon is a relatively young company,

it was unable to reasonably estimate the refunds it would need to make reserves for. As a result, the Company was required to not recognize any revenue until after the end of a given refund period. It failed to do this. One effect of this violation is that it portrayed the Company as producing more revenue than it really was. The true amount of revenue would have been evident if the refund reserves had properly been accounted for.

36.    On March 30, 2012, *The Financial Times* published an article entitled "Groupon restates 2011 results," which stated in part:

> Groupon has revealed an accounting restatement that had the effect of wiping out its operating profit for the final months of last year, extending the series of financial hiccups that have bedevilled the fast-growing online coupons company.
>
> ***The news late on Friday included an admission of "material weakness" in its internal controls and comes just six months after its initial public offering***. It triggered a 7 per cent drop in its shares in after-hours trading.
>
> Groupon blamed the restatement on its failure to account properly for its move into new markets where there is a higher chance that consumers will demand a refund.
>
> Customers who buy coupons that give a discount on high-value services, such as laser eye surgery or hair removal, are more likely to ask for their money back, according to the company, forcing it to withhold more of its money in a refund reserve. The expansion into higher-risk categories like this only took place late last year, Groupon said, leading to a restatement just of the final quarter's figures.
>
> The accounting change reduced the company's reported operating income for the period by $30m - more than wiping out the $ 15m it had previously reported for the period. It had less impact on revenues, shaving $14.3m from the $506m that had been reported before.

37.    Also on March 30, 2012, *Seeking Alpha* published an article entitled "Brace For More Surprises: Groupon Restates Earnings, Reveals Weakness in Financial Controls," which stated:

> After traders packed up for the weekend, Groupon (GRPN) issued two warnings during the evening of March 30th.

First, Groupon discovered it under-estimated its refund rate for the previous quarter. As a result, the company revised downward its revenue and earnings numbers:

> "The revisions resulted in a reduction to fourth quarter 2011 revenue of $14.3 million. The revisions also resulted in an increase to fourth quarter operating expenses that reduced operating income by $30.0 million, net income by $22.6 million, and earnings per share by $0.04."

This means GRPN actually had a greater loss for the last quarter. GRPN claims in its 10K filing released in parallel with the restatement that it has fixed its refund model to include a change in deal mix and higher priced offers. GRPN does not indicate whether these shifts represent a one-time change or an on-going, dynamic change. GRPN is holding firm on its guidance for the current quarter, so the company is implying the shift could be temporary and/or seasonal/cyclical. It is of course possible GRPN got blindsided with a higher number of low-quality merchants. For now, I expect overall refund rates to trend upward, and I expect analysts to ask a lot of questions about this during the next conference call. Refund dynamics will get the spotlight as a source of potential uncertainty in GRPN's revenues and profits.

Second, GRPN warned that it "..identified a material weakness in [its] internal control over financial reporting which could, if not remediated, result in material misstatements in our financial statements." The details are included in the company's 10K filing. GRPN is now expanding the scope of a review of its internal controls mandated by its IPO filing so that it can understand the source of the weakness and fix it. The 10K makes it clear that the conclusion of this review could uncover more financial surprises at an as yet undetermined time:

> "Although we plan to complete this remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our initiatives may not prove to be successful in remediating this material weakness. If our remedial measures are insufficient to address the material weakness, or if additional material weaknesses or significant deficiencies in our internal control over financial reporting are discovered or occur in the future, our consolidated financial statements may contain material misstatements and we could be required to restate our financial results."

Until this issue is resolved, the implied risk premium for GRPN grows larger. GRPN's stock dropped as much as 10% in after-hours trading. Curiously, GRPN's stock rallied into these revelations.

38.     On this news, Groupon's stock dropped $3.10 per share to close at $ 15.28 per

share on April 2, 2012, a decline of 17%.

39.     On April 3, 2012, the *Wall Street Journal* reported that, "The Securities and Exchange Commission is examining Groupon Inc.'s revision of its first set of financial results as a public company, according to a person familiar with the situation."

## DAMAGES TO THE COMPANY

40.     Groupon has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.   As a direct and proximate result of the Individual Defendants' conduct, Groupon has been seriously harmed and will continue to be.   Such harm includes, but is not limited to:

     a.   costs incurred in responding to the SEC probe;

     b.   costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

     c.   substantial loss of market capital;

     d.   potential liability due to currently filed securities class actions; and

     e.   any fines that are a result of the Company's violations of the federal securities laws.

41.     In addition, Groupon's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.   Specifically, it now appears to the investing public that the Company has engaged in systematic use of misleading accounting throughout the IPO process and as a public Company.   The financial viability of the Company and the motives of management are now in serious doubt.

42.     As a result, these actions have irreparably damaged Groupon's corporate image and goodwill.   For at least the foreseeable future, Groupon will suffer from what is known as the

"liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Groupon's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

43.     A pre-suit demand on the Groupon Board is futile, and therefore, excused.  This is because despite knowing that the Company's accounting controls had been questioned during the IPO process, and knowing that a lack of controls over accounting would cause the Company substantial harm, the Individual Defendants breached their fiduciary duties by permitting Groupon function without such controls during the essential, high scrutiny-period during and immediately after the IPO.  In so doing, defendants exposed the Company to severe damage and injury.  Consequently, defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand.  Thus, demand on the Board is futile, and therefore excused.

44.     The current Board of Groupon consists of the following eight Individual Defendants: Lefkofsky, Barris, Efrusy, Hobson, Keywell, Leonis, Mason, and Schultz.  These defendants have failed to exercise reasonably appropriate oversight over the internal controls for accounting.

45.     Defendant Mason is primarily employed as the CEO of Groupon and is a founder of the Company.  As such, he derives his primary source of income from his employment at the Company and his professional reputation is inextricably bound to his role at Groupon.  Moreover, Mason stands to gain hundreds of millions, if not billions of dollars from the sale of Groupon stock.  Nonetheless, leading up to and during the IPO, Mason permitted the Company to function without effective accounting controls even though he was undeniably aware of the

following: (i) once the Company began the process of going public, it was required to comply with additional accounting rules and regulations; (ii) because the Company had previously been private for its entire existence, this meant that the Company would need to institute new financial controls in preparation for the IPO; (iii) the accuracy of the Company's financial disclosures and its financial condition had been questioned publicly prior to the IPO; and (iv) as a result of these facts, the Company's financial controls were in need of significant oversight. Defendant Mason has failed to take any effective action institute functioning controls over the Company that he is charged with running. Due to defendant Mason's inaction in the face of obvious risks, Groupon has been seriously damaged. As result, demand on defendant Mason is futile.

46.         Defendant Lefkofsky is the Executive Chairman of the Board and a founder of the Company. As such, he derives substantial income from his employment at the Company and his professional reputation is inextricably bound to his role at Groupon. Lefkofsky stands to gain hundreds of millions, if not billions of dollars from the sale of Groupon stock. Nonetheless, leading up to and during the IPO, Lefkofsky permitted the Company to function without effective accounting controls even though he was undeniably aware of the following: (i) once the Company began the process of going public, it was required to comply with additional accounting rules and regulations; (ii) because the Company had previously been private for its entire existence, this meant that the Company would need to institute new financial controls in preparation for the IPO; (iii) the accuracy of the Company's financial disclosures and its financial condition had been questioned publicly prior to the IPO; and (iv) as a result of these facts, the Company's financial controls were in need of significant oversight. Defendant Lefkofsky has failed to take any effective action institute functioning controls over the Company that he was and is the Executive Chairman of. Due to defendant Lefkofsky's inaction in the face

of obvious risks, Groupon has been seriously damaged. As result, demand on defendant Lefkofsky is futile.

47.     Defendants Mason, Lefkofsky, and Keywell are founders of the Company and controlling shareholders, holding shares representing approximately 57.8% of the Company's voting power. These three defendants, by their position as controlling shareholders, have profited off of the Company's improper accounting practices and continue to do so. As such, their interests conflict with the interests of unaffiliated minority shareholders and demand on defendants Mason, Lefkofsky, and Keywell is futile.

48.     Defendants Efrusy, Leonsis, and Schultz are members of the Audit Committee. Among other things, the Audit Committee of the Board is responsible for oversight of the quarterly regulatory reporting process, internal compliance audits, results of external audits, and review of management's reports on cases of financial misconduct by employees, officers or directors. Nonetheless, the Audit Committee failed to institute sufficient processes for managing the business and financial risks created by the failure to institute functioning controls over accounting. By such actions, defendants Efrusy, Leonsis, and Schultz breached their duties by failing to sufficiently monitor the Company's business and financial risks. As a result of these defendants' breach of their duties, any demand upon them is futile.

49.     The Nominating and Governance Committee is currently comprised of defendants Efrusy, Keywell, and Leonsis. According to its charter, among other things, the Nominating and Governance Committee of the Board is responsible for "[r]eview[ing] potential conflicts of interest of prospective and current directors… [a]ssist[ing] the Board in developing and implementing 'best practices' to enhance the quality of the Company's corporate governance. Monitor[ing] compliance with the Company's corporate governance policies." Nonetheless, the

Nominating and Governance Committee failed to institute sufficient "best practices" or sufficiently monitor compliance with the Company's own corporate governance policies over financial reporting to prevent Groupon from violating GAAP, admitting to material weaknesses in its financial controls, and restating *the only Form 10-K it has ever filed*. By such actions, defendants Efrusy, Keywell, and Leonsis breached their fiduciary duties by allowing the Company to operate with such deficient controls over compliance with corporate governance policies the Company has been exposed to massive liability. Thus, demand on defendants Efrusy, Keywell, and Leonsis is futile.

50. The Individual Defendants have failed to take action against those who are responsible for permitting Groupon to function without effective accounting controls since its very inception as a public company, including themselves. The Individual Defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein. Because six of the eight Individual Defendants have served on the Groupon board together for three years or more and worked together to take the Company public to their own substantial gain, they have developed professional relationships, are friends and have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action. Thus, demand on the Board is futile and therefore excused.

51. The Individual Defendants' decision to deprive Groupon of legally sufficient internal controls resulted in the inability to ensure that the Company's financial controls and accounting procedures were in compliance with applicable internal guidelines, public statements, regulations, and laws. A mere five months after going public, the Company

22

has admitted that it has material weaknesses in its financial controls.  There has been no assurance made that this problem is not more extensive than initially disclosed, and/or that it does not significantly undermine the integrity of the Company's prospectus and IPO documents. The wrongdoing alleged herein is not the product of a rogue employee or a group of such employees, but a systemic failure.  Since the Company determined to go public, the directors knew or should have known that: (i) once the Company began the process of going public, it was required to comply with additional accounting rules and regulations; (ii) because the Company had previously been private for its entire existence, this meant that the Company would need to institute new financial controls in preparation for the IPO; (iii) the accuracy of the Company's financial disclosures and its financial condition had been questioned publicly prior to the IPO; and (iv) as a result of these facts, the Company's financial controls were in need of significant oversight.  In the face of these red flags, the Board exhibited an intentional and/or reckless failure to exercise oversight of the Company's financial reporting processes.  Thus, demand on the entire Board is futile and therefore excused.

52.     As particularized herein, to properly prosecute this lawsuit, Groupon directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.  This they will not do.  A majority of the defendants are exposed to potential liability for operating Groupon without the internal controls over financial reporting that would have detected and prevented material weaknesses and inaccurate representations detailed herein.  Thus, demand on the Individual Defendants is futile, and therefore, excused.

53.     The Individual Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of

control and the substantial financial benefit derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Likewise, these defendants have and will continue to receive substantial remuneration predicated upon Groupon's successful IPO at an offering price that now appears to have been improperly inflated. The acts complained of herein have resulted in substantial economic benefits to Groupon – as well as to defendants through their large and continuing compensation and stock ownership – without corresponding recognition or accounting for the correlated liability and risk that Groupon was subject to as a result of its lack of internal controls. Individual Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into Groupon's balance sheet. Thus, demand on the Individual Defendants is futile, and therefore, excused.

54. Groupon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet, the Individual Defendants have not filed any lawsuits against defendants or others who were responsible for the wrongful conduct to attempt to recover for Groupon any part of the damages the Company suffered and will suffer thereby. Thus, demand on the Board is futile, and therefore, excused.

55. Demand on the Individual Defendants is futile because during the IPO process, prior to the IPO, when faced with repeated opportunities institute functioning financial controls at time when doing so would have been appropriate, the Board failed to do so. Moreover, at present the Board apparently has instituted no internal investigation and convened no committee of independent directors to assess the scale of deficiencies in financial controls or the harm to the company resulting from the lack of controls, even though the Individual Defendants could not be

unaware of the importance of such controls.  The Individual Defendants were either aware of serious systematic problems in the Company's financial controls or were in complete dereliction of their duties as directors in not being aware.  Nonetheless, the Individual Defendants have not publicly disclosed any meaningful steps to reveal the full extent and implications of the lack of financial controls and the restatement of financial results.  Even at present, with the Company facing hundreds of millions of dollars of potential liability in already filed securities class actions, the Board has not made an effort to conduct an exacting investigation to expose the true extent of the problems.  As a result, demand is excused.

56.     In light of the importance of accounting controls to Groupon during the IPO process, demand on the Board is futile.  Throughout the IPO process, starting with its first Form S-1 registration statement filed with the SEC, Groupon has repeatedly been confronted with allegations that it was using improper and misleading accounting procedures.  As a result of the multiple changes and restatements the Company was forced to make in its public filings prior to the IPO, the Individual Defendants could not have been unaware that the Company was required to follow certain accounting procedures and the substantial oversight and functioning controls were required to ensure that it did.  In light of this, the Individual Defendants have shown a consistent and sustained unwillingness to take the discharge of their fiduciary duties seriously by instituting functioning financial controls as demonstrated by their inaction in the face of the following red flags:

a.   The Company first filed its Form S-1 in June 2011 containing a controversial non-GAAP accounting metric, ACSOI.  The Company was forced to amend its subsequent form S-1's by eliminating use of the ACSOI because it was misleading.

b.  In September 2011, the Company was forced to restate its financial results from the first half of 2011.  The effect of the restatement was enormous: the Company's revenue for the period decreased with the restatement from *$1.5 billion to $688 million*.  In fact, the change in financial position was so large that it prompted questions about whether the Company could even afford to go public.  Defendant Mason acknowledged his awareness of these questions in his above excerpted letter to Groupon.

c.  Throughout its multiple Forms S-1 and Prospectus filed in connection with the IPO and signed by the Individual Defendants, the Company repeatedly acknowledged that due to the IPO and its subsequent conversion into a public company it would be forced to produce financial statements with a higher level oversight and that it would incur costs as a result of the higher accounting standards.

57.  Seven of the eight members of the Board signed each and every version of the Form S-1 since the original one filed on June 2, 2011.  As a result, these seven board members could not have been unaware of the Company's multiple restatements and accounting control deficiencies prior to going public.  These seven board members were on notice that the Company's accounting controls were susceptible to a wide variety of improper practices, they knew that the Company was exposed to significant risk as a result, and they failed implement sufficient controls so as to prevent the problems from recurring.  As a result, these seven defendants breached their fiduciary duties by failing to sufficiently monitor an area of the Company's business that they knew was in need of oversight.  Because these Board members were previously given multiple opportunities to implement sufficient controls and to monitor and

supervise the Company's accounting processes and failed to do so, demand on these board members is a futile and useless act.

58.     The Groupon Board is dominated by directors that are specifically implicated in the wrongdoing: each member is either: (a) a founder and controlling shareholder; (b) a member of the audit committee; or (c) signed the misleading IPO documents.  As a result, the Board is dominated by persons who are specifically implicated in the wrongdoing and therefore cannot be expected to sue themselves.

59.     Groupon's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of Groupon.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Groupon against these defendants, known as, inter alia, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Groupon, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as the action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I

## Break of Fiduciary Duty

60.     Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

61.     Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Groupon's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

62.     Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company.  Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Groupon.

63.     In breach of their fiduciary duties owed to Groupon, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Groupon's business, rendering them personally liable to the Company for breaching their fiduciary duties.

64.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, Groupon has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Abuse of Control

65.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

66.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Groupon, for which they are legally responsible.

67.     As a direct and proximate result of defendants' abuse of control, Groupon has sustained significant damages.

68.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Groupon has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

69.     By reason of the foregoing, Groupon has been damaged.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Groupon and that plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Groupon;

C.     Determining and awarding to Groupon the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Directing Groupon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Groupon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Groupon to nominate at least three candidates for election to the Board;

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.     Determining and awarding to Groupon exemplary damages in an amount necessary to punish Individual Defendants and to make an example of defendants to the community according to proof at trial;

F.     Awarding Groupon restitution from defendants, and each of them;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Fed. R.Civ.P. 38(b), Plaintiff demands a trial by jury.

Dated: April 5, 2012

Theresa Monturano

By: s/Marvin A. Miller
MARVIN A. MILLER
LORI A. FANNING
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
 (312) 332-3400

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

Attorneys for Plaintiff

## GROUPON, INC. VERIFICATION

I, Theresa Monturano, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 4-4-2012

_____
Theresa Monturano